**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**


DOYLE "ROCKY" BROWN,

        **Plaintiff,**

vs.                                                       Civ. No.  08-453 JH/RLP

BRENT McGILL and
MUELLER SUPPLY CO., INC.,

        **Defendants.**


## MEMORANDUM OPINION AND ORDER

This matter is before the Court on cross motions for summary judgment: *Plaintiff's Motion for Summary Judgment On His Claims for Violations of the Family and Medical Leave Act* [Doc. No. 93], and *Defendants' Motion for Summary Judgment* [Doc. No. 90].  Defendants move for summary judgment in their favor on all of Plaintiff's claims, while Plaintiff moves for summary judgment in his favor on his Family and Medical Leave Act ("FMLA") claim only.  After considering the law, the evidence, and the arguments of counsel presented in the briefs, the Court concludes that Plaintiff's motion for summary judgment should be denied, and Defendants' motion should be granted.

## LEGAL STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When parties file cross motions for summary judgment, the court may assume no evidence needs to be considered other than that filed by the parties, but summary judgment is inappropriate if material facts are in dispute.  *See Atlantic Richfield Co. v. Farm Credit*

*Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). On the other hand, "[s]ummary judgment

is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to judgment as a matter of law.'" *Jacklovich v. Simmons*, 392 F.3d 420,

426 (10th Cir. 2004) (quoting Fed. R. Civ. P. 56(c)). "Unsupported conclusory allegations, however,

do not create an issue of fact." *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1273 (10th

Cir. 2005); *see also Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004) (same).

## UNDISPUTED MATERIAL FACTS

Except where otherwise noted, the following facts are undisputed.

Plaintiff Doyle "Rocky" Brown ("Brown") is a former employee of Defendant Mueller

Supply Company, Inc. ("Mueller"), where he worked from October 8, 2002 until February 7, 2007.

Defendant Brent McGill ("McGill") was Brown's supervisor. Mueller is a private company

manufacturing metal building products. It has 28 locations, though the Moriarty, New Mexico

branch is the only one in this state. Mueller has no other branches or employees within 75 miles of

its Moriarty location.

On September 13, 2002, Brown completed and signed a Mueller employment application that

stated, "I also understand that I will have the right to terminate my employment with Mueller, Inc.

at any time without notice and for any reason. I understand that Mueller, Inc. has the same right."

Brown testified at his deposition that he did not understand this statement and that he believed

Mueller could not fire him without cause. On October 8, 2002, Mueller hired Brown as a local

driver. Brown filled out both an employment application and a new hire process form that stated that

his employment was at will, and that he could be terminated at any time without notice. Again,

Brown testified that he signed this form but did not understand it. Mueller also provided Brown with

2

a document titled "Your Rights Under the Family and Medical Leave Act" which states, "Employees are eligible if they have worked ... at a site where the employer employs at least 50 employees within 75 miles."

On March 5, 2003, Mueller promoted Brown to Warehouse Supervisor, and as such his duties were to lead, manage, and supervise both the warehouse and all shipping and receiving.  The written job description for the position includes the following as essential job functions: providing customer-focused activities, managing daily activities in the warehouse, maintaining accurate shipping and receiving schedules, maintaining accurate inventory levels, conducting timely and accurate inventory cycle counts, monitoring returned material and ensuring proper return to inventory; managing warehouse and delivery assets, and "effective development, leadership, management, and utilization of warehouse employee resources."   On January 19, 2004, Brown signed a form titled "Employee Handbook Acknowledgment & Consent" which stated that the handbook was not intended to create an employment contract or to obligate Mueller to provide any benefit.  It also stated that "the employee has the right to terminate his/her employment at any time without cause, and Mueller Inc. has the same right."   Brown testified that although he signed this statement, he did not read or understand the handbook or the associated Workforce Policy Manual.

In April of 2005, Brown told McGill that his doctors believed he had cancer and that he would need colon surgery.  McGill responded, "No problem, guy.  Take the time you need, get your surgery, get better."  McGill then gave Brown paperwork related to FMLA leave to complete, even though he knew that Brown was not eligible for FMLA coverage because Mueller did not have 50 employees within 75 miles of its Moriarty warehouse.  McGill knew that Brown was not eligible under the statute, but he did not inform Brown of that fact.  Accordingly, on April 15, 2005, Brown submitted a form titled "Certification of Health Care Provider" in which his doctor certified that Brown would

3

need medical leave for a surgery scheduled on April 21.  Mueller then provided Brown with a form titled "Employer Response to Employee Request" informing Brown that he was eligible for FMLA leave and stating, "Except as explained below, you have a right under the FMLA for up to 12 weeks of unpaid leave in a 12-month period . . ."  The form also stated that during his leave, Brown's health benefits would be maintained, and upon returning from leave he would be reinstated to the same or an equivalent job with the same pay, benefits, and terms and conditions of employment.  Brown understood this form as approval to take leave for his surgery, and he testified that regardless of such approval, he would have taken the necessary time off because his condition was life-threatening.  However, Brown also testified that he would not have taken as much time off after the surgery if he had known it would not be covered by the FMLA.  In any event, Brown returned to work on May 23, 2005, and McGill gave him a Job Performance Review rating his overall performance as "Excellent."  At this time, Brown believed McGill to have been supportive of his situation.  However, Brown began taking a significant number of days of leave without pay for medical reasons, and he admits he would have been unable to work on those days.  Again, Brown contends that he would not have taken as much time off had he known it was not covered by the FMLA.

On January 31, 2006, Mueller provided Plaintiff with another "Employer Response to Employee Request for Family or Medical Leave" form for additional FMLA leave he was taking for medical reasons.  Then, Mueller placed Brown on intermittent FMLA leave because, due to his serious health condition, he had missed an extensive amount of work in the eight months since his colon surgery.  Brown believed that he was eligible for FMLA leave and that he could not lose his job for taking such leave.  On May 7, 2006, McGill gave Brown another Job Performance Review rating his overall performance as "Proficient" but noting that his top strength was taking care of inventory issues.  In addition, Brown received a pay increase that was larger than the increase he had

4

received the previous year, when he his performance had been rated as "Excellent."  However, Mueller has offered evidence to show that this increase stemmed primarily from a pay range reclassification and had little to do with Brown's job performance the previous year.

Approximately six months later, on November 17, 2006, McGill sent Mueller's Human Resources Manager, Jeff Benton ("Benton"), an email regarding training another employee to act as a "backup" the Warehouse Manager position held by Brown, due to Brown's changing health. McGill wrote, "[Brown] does his job very well I just don't want to get caught without a plan if something were to happen."  McGill testified that he did not, in fact, believe that Brown was doing his job very well and that over the previous four months he had been addressing performance issues directly to Brown.  On the other hand, Brown testified that up to this point McGill had never informed him that he had concerns about Brown's job performance.

On January 2, 2007, McGill called his supervisor, Tommy Hollis, to seek advice on addressing Brown's performance issues.  Hollis, in turn, relayed those concerns to Benton, who communicated with McGill on the subject via email.  In his email, McGill acknowledged that he had previously overlooked Brown's poor performance because of his illness.  The next day, January 3, Benton and  McGill decided to give Brown a "Performance Improvement Plan" ("PIP") addressing their concerns about his inventory management, cycle counts, deliveries, and other issues relating to his job as warehouse manager.  It also set expectations regarding his future performance.  Brown maintains that McGill never told him that his cycle counts were unacceptable.  However, Brown admits that a variance of 1% shows a serious problem in inventory management, and applying that principle, the cycle counts in September and December of 2006 were unacceptable.  These variances would have been lower if daily cycle counts were completed properly.  They may have stemmed from mistakes made by employees other than Brown, but the undisputed evidence shows that

5

ultimately, as Warehouse Manager that was Brown's responsibility.

On January 8, 2007, Benton notified all managers at Mueller, including Brown, of a change in Mueller's practices regarding FMLA leave. Specifically, he stated that while it had been Mueller's practice to cover its employees at all locations even if the location did not include at least 50 employees within a 75 mile radius, Mueller was discontinuing that practice due to growth and staffing requirements. Benton also stated that employees at "non-covered" locations who were on FMLA leave would remain eligible "according to their current qualifying event," but not for future events. Thus, this change in Mueller's practice had no effect on Brown's ability to take intermittent leave or the decision to terminate his employment.[1] On January 24, 2007, three weeks after receiving the PIP, Brown brought a doctor's note to work. It stated that Brown had been seen for colon cancer, bronchitis, and fatigue, and that he could return to work on February 8, 2007. At that time, Brown had already used 62 full days, or 12.4 weeks, of medical leave since February 1, 2006, though he had not been informed previously that he was near the limit of his medical leave. Although Brown admits that this leave was medically necessary and his doctor said that it would do him good to stay home, he also states that he could have come to work if necessary, even though he would have been in pain. Between January 8, 2007 and February 7, 2007, Brown missed fifteen days of work for designated FMLA leave.

On February 7, 2007, Benton sent Brown a letter informing him that from the period January 31, 2006 through February 1, 2007, he had exhausted twelve weeks of FMLA leave. Brown does not dispute that he had, in fact, exhausted twelve weeks of leave at that point, and in fact, he had used 71 days, or more than fourteen weeks. Brown testified that if he had known it was not covered by

---

[1] Brown was the only Mueller employee who was then on designated FMLA leave at a Mueller office that would no longer be covered by FMLA benefits for future qualifying events.

the FMLA, he would not have taken as much time off, even though the time off was medically necessary, he could not have performed all his job duties, and he could not have performed up to his own expectations.  Also on February 7, 2007, Brown brought in another doctor's note stating that he needed an additional three weeks of leave and could return to work on March 1.  Brown testified that he did not disagree with his doctor's opinion that he needed the time off, and stated that he could have come to work, but "I don't know how effective I would have been."  However, he also testified that had he known his job was at risk, he would not have taken the time off.  In any event, after receiving the note, Benton and McGill decided to terminate Brown's employment with Mueller because his absences exceeded the leave allowed by the FMLA.

On the morning of February 8, 2007, Benton and McGill informed Brown of his termination by telephone.  They cited poor work performance and excessive absenteeism.[2]  Brown offered to come to work "against doctor's orders," but Benton refused because Brown had previously presented a doctor's note stating that he could not return to work until March 1, 2007.  Benton sent Brown a confirming letter.  Prior to February 8, 2007, no one informed Brown that he would lose his job if he did not return to work on that date.

---

[2] It is unclear whether McGill evaluated Brown based upon days when he was out on FMLA leave.  In his deposition, McGill stated that he only evaluated Brown on days when he was able to come to work, but when asked about whether he rated Brown on certain specific days when he was not at Mueller, McGill said, "maybe so."  Furthermore, there is a fact dispute as to whether Brown had sufficient opportunity to correct the performance problems outlined in the January 3, 2007 PIP before he was terminated on February 8, 2009.  Brown testified that he was trying to improve on the areas of deficiency cited in the PIP, but that he had not had sufficient time and "couldn't really say one way or the other" if he had, in fact, improved.  On the other hand, McGill testified that even on the days when Brown was at work, the "job wasn't getting done."  Therefore, based upon his observations, Brown had not made an effort to improve in areas discussed in the PIP.  Similarly, Benton testified that Brown was terminated because he wasn't completing his job duties, and therefore they fired him out of business necessity.

The only accommodation that Brown requested for his health problems was to work from home, but Benton and McGill determined that he could not perform many of the essential duties of the job from home. Brown admits that he could not perform all of his supervisory duties from home. However, he felt that some of these tasks could be delegated to others, and that this would not be a permanent accommodation.

Brown has asserted claims for disability discrimination in violation of the Americans With Disabilities Act ("ADA"), and the New Mexico Human Rights Act ("NMHRA"), violations of the Family Medical Leave Act ("FMLA"), breach of contract, and intentional infliction of emotional distress.

## DISCUSSION

### I.   CLAIMS FOR DISABILITY DISCRIMINATION UNDER THE ADA AND NMHRA[3]

In Counts I and III of his First Amended Complaint [Doc. No. 91], Brown alleges that Mueller violated the Americans With Disabilities Act ("ADA") and the New Mexico Human Rights Act ("NMHRA") by denying him reasonable accommodation. Brown also claims that Mueller discriminated against him the basis of his disability by terminating his employment.

#### A.   "Failure to Accommodate" Claim

In this case, the parties agree that in order to survive a motion for summary judgment, Brown must first establish a prima facie case of discrimination, showing a genuine issue of material fact exists on each of three points: "(1) []he is a disabled person as defined by the ADA; (2) []he is

---

[3] Defendant argues that in interpreting the NMHRA, New Mexico courts rely upon federal cases interpreting the ADA. Plaintiff does not contradict this assertion, and both parties rely upon federal cases in their arguments. Accordingly, the Court will also rely upon federal law interpreting the ADA in order to analyze both the NMHRA and ADA claims.

qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired;" *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005); and (3) the employer did not take reasonable steps to accommodate his disability. *Albert v. Smith's Food & Drug Centers, Inc.*, 356 F.3d 1242, 1252 (10th Cir. 2004) (applying the burden shifting approach in a failure-to-accommodate case). If the plaintiff establishes a prima facie case, "the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its employment decision. Should the defendant articulate a nondiscriminatory reason, the burden shifts back to plaintiff to show a genuine issue of material fact as to whether defendant's reason for the [failure to accommodate] is pretextual." *MacKenzie*, 414 F.3d at 1274 (citation omitted). In other words, the burden shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) has been specifically adopted to ADA claims for failure reasonably to accommodate the disabled employee. *White v. York Int'l Corp.*, 45 F.3d 357, 360-61 (10th Cir. 1995).

Under the second element of the prima facie case, the Court must employ a two-part analysis to determine whether an individual is qualified: "First, the court determines whether the individual can perform the essential functions of the job. . . . Second, if (but only if) the court concludes that the individual is unable to perform the essential functions of the job, the court determines whether any reasonable accommodation by the employer would enable him to perform those functions." *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1190 (10th Cir. 2003) (internal citation omitted); *see also* 42 U.S.C. § 12111(8) (defining "qualified individual with a disability").

Defendants argue that Brown cannot satisfy the second and third elements of his prima facie case. Specifically, they argue that the essential functions of Brown's job as a warehouse supervisor required his physical presence at the warehouse, and that the accommodation that Brown sought—a request to work from home on an intermittent basis—is "unreasonable on its face" because it seeks

to eliminate one or more essential functions of the position.  At his deposition,  Brown testified that he could perform many of the essential functions of the warehouse manager job from home, both by remotely logging into the Mueller computer system and by speaking with Mueller's employees and customers by telephone.  Brown testified that he could not permanently supervise the warehouse from a remote location, but that he could do so "from time to time."  However, Brown also admitted that there were certain tasks that he could not perform from home.  These included quarterly inventory counts, in which he and other warehouse employees would physically count the products on the shelves.  Similarly, warehouse employees conducted random inventory counts, and Brown sometimes participated in these if no one else was available or if the count had to be completed by a particular deadline.  In such cases, random counts also required Brown's presence at the workplace.  Brown testified that most of his interactions with customers were over the phone, and therefore could be done from home, but that occasionally he did need to speak face-to-face with customers who came to the warehouse.  Brown stated that as warehouse supervisor, he could delegate tasks to warehouse employees by phone as easily as he could in the warehouse, but again, he admitted that he would have to be in the warehouse to physically confirm whether such tasks had actually been completed. Instead, he suggested that he could ask another employee to check on his behalf.  Brown stated that part of his job as supervisor of the other warehouse employees was to train them to do their jobs properly, and that he could not do that when he was away from the warehouse.  Similarly, he could not correct employees' failure to adhere to safety policies, but rather would have to rely on others to report unsafe practices to him by phone.

It is undisputed that given his health problems, Brown was unable to work in the warehouse full time and perform his job duties.  Therefore, under *Davidson* the Court must determine whether any reasonable accommodation by Mueller, such as allowing Brown to work from home, would

enable him to perform those functions.  Brown bears the burden of showing he is able to perform the essential functions of his job.  *US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002).  Here, the Court concludes that Brown has failed to create a genuine issue of material fact on that aspect of his prima facie case.  In his deposition, Brown has admitted that while he could perform some of his essential duties as warehouse supervisor from home, he could not perform all of them.  Instead, he would have to rely on other employees to carry out some of the duties, while other duties—particularly those requiring on site counting of inventory items, face-to-face interaction with customers, and direct supervision and training of his subordinates to make sure that they were performing their work properly and safely—he could not do at all from home.  Thus, work from home—the only accommodation that Brown sought from Mueller—was not a reasonable accommodation of Brown's disability.

Brown suggests that Mueller could have accommodated him in other ways, such as by delegating some of his duties to others in his absence, temporarily reassigning him, hiring temporary employees to perform his duties, or allowing him to take additional medical leave.  With regard to delegating Brown's duties as warehouse supervisor to other employees, Mueller correctly points out that "[a]n empoyer is not required by the ADA to reallocate job duties in order to change the essential function of a job."  *Milton v. Scrivner, Inc*., 53 F.3d 1118, 1124-25 (10th Cir. 1995) ("An accommodation that would result in other employees having to worker harder or longer hours is not required.").  As to temporarily reassigning Brown, he comes forward with no evidence that there was a position to which he could have been reassigned or that such a reassignment was feasible.  With regard to hiring temporary employees to assist with his duties, Brown has come forward with evidence, in the form of testimony by McGill, that Mueller sometimes used "temps."  However, that testimony also reveals that hiring a temp was unworkable here because of the unpredictability of

11

Brown's absences, and because sometimes Mueller did not know until mid-morning whether he would be able to work on a given day—too late for Mueller to find a temp.

Finally, Brown suggests that Mueller could have accommodated him by permitting him to take additional medical leave beyond that which he had taken under the FMLA. "An allowance of time for medical care or treatment may constitute a reasonable accommodation." *Rascon v. U.S. West Communications, Inc.*, 143 F.3d 1324, 1333-34 (10th Cir. 1998). In *Rascon*, the Tenth Circuit qualified this statement, however: "[A]n indefinite unpaid leave is not a reasonable accommodation where the plaintiff fails to present evidence of the expected duration of [his] impairment." *Id.* at 1334; *see also Hudson v. MCI Telecommunications Corp.*, 87 F.3d 1167 (10th Cir. 1996) (holding that unpaid leave of indefinite duration was not a reasonable accommodation where plaintiff failed to present any evidence of the expected duration of her impairment or prognosis). Here, Brown has come forward with no evidence as to the period of time for which he would have needed additional leave. It is undisputed that he had presented Mueller with a doctor's note stating that he needed to be at home from January 24, 2007 until February 8, 2007. On February 7, 2007, he provided Mueller with another note stating that he could not return to work until March 1, 2007. Neither note stated Brown's prognosis; in fact, both notes stated that all of Brown's medical conditions were still the same or worse, with the exception of the second note, which stated that his malaise had improved, while his other conditions were the same. Based on these notes, which contain relatively little detail, as well as Brown's past history of medical leave, Mueller could not have reasonably been expected to know how long Brown would need to be out on additional medical leave. Therefore, this accommodation was not reasonable.

Accordingly, the Court finds that Defendants are entitled to summary judgment on this claim because Brown has failed to create a genuine issue of material fact on his prima facie case.

12

Specifically, he has failed to show that he was qualified, with or without reasonable accommodation, to perform the essential functions of the warehouse manager job, and he has failed to show that Mueller did not take reasonable steps to accommodate his disability.

**B.      Wrongful Termination Claim**

Defendants also move to dismiss Brown's claim that they wrongfully terminated his employment in violation of the ADA.  As with a failure-to-accommodate claim, the wrongful termination claim must be analyzed under the *McDonnell-Douglas* burden-shifting framework that includes the plaintiff making a prima facie showing, followed by the employer demonstrating a legitimate, nondiscriminatory reason for its employment action, with the burden shifting back to the plaintiff to show a genuine issue of material fact as to whether the employer's proffered reason is pretextual.  Here, Defendants contend that Brown cannot make his prima facie case and that he cannot show pretext.

A person with a protected disability establishes a prima facie case of discriminatory discharge by demonstrating that: (1) he was qualified, with or without reasonable accommodation, to perform the essential functions of his job; and (2) his employer terminated his employment under circumstances giving rise to an inference that the action was based on his disability.  *Tesh v. U.S. Postal Serv.*, 349 F.3d 1270, 1272 (10th Cir. 2003) (quoting *Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1259 (10th Cir. 2001)).  Here, the Court has already found that Brown has not shown that he was qualified, with or without reasonable accommodation, to perform the essential functions of a warehouse manager.  Accordingly, Defendants are entitled to summary judgment on his claim of discriminatory discharge as well.

## II.      BREACH OF CONTRACT CLAIMS

In Count IV of his First Amended Complaint, Brown alleges that Defendants' actions, as well as oral and written statements, created express and implied contracts between Brown and Mueller. In New Mexico, generally an employment relationship is "at will" and either the employer or the employee may terminate the relationship absent an express contract to the contrary. *See Gormley v. Coca-Cola Enters.*, 135 N.M. 128, 134, 85 P.3d 252, 258 (2003) (citing *Lopez v. Kline*, 124 N.M. 539, 953 P.2d 304 (1997)). An exception to the general rule, however, exists when there is an implied contract limiting the employer's authority to discharge. *See id.* (citing *Lopez v. Kline*, 124 N.M. at 306, 953 P.2d at 541).

In this case, Brown does not point to the existence of an express contract between him and Mueller which would alter the at will employment relationship. In other words, he does not contend that there was an offer and acceptance supported by consideration which altered the at-will employment relationship. Accordingly, the Court turns to the question of whether an implied contract existed between the parties. An implied contract may be found (i) in written or oral representation; (ii) in the parties' conduct; or (iii) in a combination of representations and conduct. *See id.*, 135 N.M. at 134-35, 85 P.3d at 258-59 (citing *Newberry v. Allied Stores, Inc.*, 108 N.M. 424, 427-28, 773 P.2d 1231, 1234-35 (1989)). In *Gormley v. Coca-Cola Enterprises*, the Court of Appeals held that whether an implied contract exists is a question of fact, based on the totality of the circumstances, including the employer's oral, explicit, and definite representation. *See* 108 N.M. at 134-35, 85 P.3d at 258-259 (citing *Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 669, 857 P.2d 776, 780 (1993)); *Garrity v. Overland Sheepskin Co.*, 121 N.M. 710, 917 P.2d 1382 (1996). The existence of an implied contract involves a determination of whether an employee's expectations regarding the terms of her employment are reasonable. *See Hartbarger*, 115 N.M. at 672 ("An

14

employer does not have to issue a policy statement limiting its power to discharge, but if the employer chooses to do so and creates a reasonable expectation on the part of the employee, it is bound to fulfill that expectation."). This, in turn, depends in large measure upon whether promises or offers made by the employer were sufficiently explicit to give rise to the reasonable expectations by the employee. *Id*. ("In examining implied employment contract cases, we always have required that the *promise* that is claimed to have altered the presumed at-will term *be sufficiently explicit* to give rise to reasonable expectations of termination for good cause only.") (emphasis in original).

Here, the Court finds that Brown has come forward with sufficient evidence of an implied contract to provide Brown with FMLA rights, despite the fact that he was not entitled to them under the statute. It is undisputed that Mueller and McGill told Brown that he was eligible for FMLA leave as a result of his cancer and, in accordance with the company's longstanding practice, treated him as such. They required him to fill out FMLA paperwork and gave him written documents informing him of his FMLA rights. In January of 2007, when Benton notified all managers at Mueller, including Brown, that the company was discontinuing its practices regarding FMLA leave, he specifically stated that employees (such as Brown) working at "non-covered" locations who were on FMLA leave would remain eligible "according to their current qualifying event," but not for future events.

Based on the foregoing, the Court finds that Defendants' oral and written statements to Brown were sufficiently specific such that it was objectively reasonable for Brown to believe that he had full FMLA rights as part of his employment with Mueller. Thus, there is a genuine issue of material fact on the claim that an implied contract to that effect existed between Mueller and Brown. The Court rejects Defendants' argument that such an implied contract fails for lack of consideration. Under New Mexico law, a factual showing of additional consideration or mutual assent to the terms of the

15

implied contract is not required. *Gormley*, 135 N.M. at 135, 85 P.3d at 259 (citing *Hartbarger*, 115 N.M. at 670-71, 857 P.2d at 781-82.

Despite the conclusion that there is a genuine issue of material fact on the existence of an implied contract, the Court must still grant summary judgment in favor of Defendants. As stated above, the implied contract at issue was one to provide Brown with FMLA rights. However, as discussed more fully in Section III herein, the Court finds that Defendants are entitled to summary judgment on Brown's claims for violation of the FMLA. Therefore the Court must also find that they are entitled to summary judgment on Brown's claim that Defendants breached their contractual duty to provide him with FMLA rights.

## III.    FMLA CLAIMS

Brown has moved for summary judgment in his favor on his claim that Mueller violated his rights under the FMLA. Similarly, Defendants have moved for summary judgment on that claim as well. The Court has considered the issues raised in both motions and discusses them together below.

### A.    Estoppel

The threshold issue is whether or not the FMLA applies to Brown.[4] It is undisputed that under the statute, an eligible employee does not include "any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50." 29 U.S.C. § 2611(2)(B)(ii). It is also undisputed that there were fewer than 50 Mueller employees both at

---

[4] As discussed elsewhere in this Memorandum Opinion and Order, there is at a minimum a genuine issue of material fact as to whether Mueller was under an implied contract to provide Mueller with FMLA rights.

Brown's Moriarty, New Mexico worksite and with 75 miles of that worksite.  However, despite the fact that Brown's employment with Mueller did not meet these standards and he was technically not protected by the FMLA, it is undisputed that Defendants told him that he was entitled to FMLA rights and treated him at such.  It is also undisputed that while he was in their employ, Defendants never told Brown that he was not entitled to FMLA rights.  Brown contends that he relied, to his detriment, on Defendants' misrepresentations that he was covered by the FMLA and that Defendants should be estopped from arguing that he has no rights under the statute.  Specifically, Brown contends that had he known that Defendants would claim that he was not covered by the FMLA, he would have taken less FMLA time off of work, and his doctor would not have prescribed the time off.  Defendants, on the other hand, contend that Brown is not entitled to estoppel because Brown did not rely on Defendants' representations to his detriment.  Defendants point out that Brown has testified that every day of FMLA leave was medically necessary, and that on those days he could not have performed all of the functions of his job "up to [his] expectations."  Thus, they claim it would have been impossible for Brown to come to work on those days, as he suggests, and therefore his actions were based not on reliance, but on medical necessity.  They argue in the alternative that if Brown was well enough to come to work on those days, then he was not entitled to take them as FMLA leave.

The Court finds that it need not decide this issue because it is moot.  As determined previously herein, there is a fact issue as to whether Mueller was bound by an implied contract to provide Brown with FMLA rights.  As a result, the Court analyzes Brown's substantive FMLA claims below.  Having concluded that Defendants are entitled to summary judgment on those claims, the Court also concludes that the issue of equitable estoppel is moot.

### B.    Violation of FMLA Rights

Assuming that the FMLA applies to Brown, either through an implied employment contract

or through equitable estoppel, the Defendants have moved for summary judgment in their favor on those claims.  Similarly, Brown moves for summary judgment in his favor.

        1.    <u>Interference</u>

Defendants move for summary judgment on Brown's claim that they improperly interfered with his FMLA rights.  Such a claim, if asserted, arises from 29 U.S.C. § 2615(a)(1), which makes it unlawful for any employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter."  Citing the recent Tenth Circuit decision *Defreitas v. Horizon Inv. Mgmt. Corp.*, 577 F.3d 1151, 1159 (10th Cir. 2009), Brown accurately states, "[t]o establish an FMLA interference claim, the plaintiff must demonstrate: (1) that []he was entitled to FMLA leave, (2) that some adverse action by the employer interfered with h[is] right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of [his] FMLA rights."  (internal citation and quotations omitted).

Defendants argue that Mueller did not interfere with any FMLA right sought by Brown.  In fact, it is undisputed that Brown received more than fourteen weeks of FMLA leave in the year preceding his termination, in excess of the twelve weeks required by the statute for any twelve-month period.  *See* 29 U.S.C. § 2612(a)(1)(D).  Further, it is undisputed that Mueller did not interfere with Brown's right under the FMLA to be restored to the position he held when his FMLA leave commenced.  At all times Brown held the job of warehouse manager.

In neither his response to Defendants' motion for summary judgment nor in his memorandum brief in support of his own summary judgment motion does Brown cite any interference with his FMLA rights by Defendants.  However, in his reply in support of his motion for summary judgment [Doc. No. 108], Brown argues that Defendants interfered with his right to FMLA leave by failing to give him reasonable accommodation—allowing him to work from home—under the ADA.  However,

18

as previously discussed, working from home was not a reasonable accommodation for Brown's job as warehouse manager, and Defendants did not violate his rights under the ADA.

There being no further argument by Brown in support of his FMLA interference claim, this portion of the Defendants' motion for summary judgment will be granted.

2.    Retaliation

The FMLA provides that it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this chapter."  29 U.S.C. § 2615(a)(2).  As with his ADA claims, Brown's FMLA retaliation claims are subject to the *McDonnell-Douglas* burden-shifting analysis: Brown must make his prima facie case, at which point Defendants must come forward with a legitimate, non-discriminatory reason for terminating his employment.  *See Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003). Then, Brown bears the burden of demonstrating that reason is mere pretext for discrimination.  *Id.*

The parties agree that, in order to make a prima facie case of retaliation, Brown must show that: (1) he engaged in a protected activity; (2) Mueller took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action.  *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006).  In this case, there is no genuine issue of material fact that a reasonable employee would have found termination of his employment "materially adverse."  Thus, the present issue before the Court is whether there is a genuine issue of material fact as to the first and third elements, protected activity[5] and causal connection.

_____

[5] Defendants argue that Brown engaged in no protected activity because he was not an eligible employee under the FMLA.  However, the Court has already found there to be a genuine issue of material fact as to whether Brown has contractual rights to FMLA coverage.  Therefore, for the purposes of this discussion the Court assumes that Brown was entitled to FMLA

Defendants argue that Brown cannot show that he engaged in a protected activity because he had no right to take additional FMLA leave at the time of his February 7, 2007 request.   It is undisputed that on that date, Brown had taken more than the allowable twelve weeks of FMLA leave in the prior twelve month period.   Therefore, it is undisputed that on February 7, 2007, when Brown asked for an additional three weeks of FMLA leave, he was not engaging in an activity protected by the FMLA, and the next day Defendants terminated his employment for excessive absenteeism and poor performance.   As Defendants have acknowledged, the Tenth Circuit has not addressed this particular issue[6], but the Eleventh Circuit has held that "the statute does not protect an attempt to exercise a right that is not provided by FMLA, i.e., the right to leave before one becomes eligible therefor."   *Walker v. Elmore Co. Bd. of Ed.*, 379 F.3d 1249, 1252-53 (11th Cir. 2004) (holding that a request for maternity leave made by employee did not constitute an attempt to exercise an FMLA right, and thus was not protected by the FMLA's retaliation provision, where requested leave would have begun several days before employee became eligible for FMLA coverage).   In his response to Defendants' motion for summary judgment, Brown does not respond to this argument regarding the first prong of his prima facie case.   In light of the foregoing, the Court agrees with Defendants that Brown has failed to satisfy the his prima facie case, and Defendants are entitled to summary judgment on that basis.

The Court also concludes, in the alternative, that Brown has failed to create a genuine issue of material fact as to whether Mueller's reasons for terminating his employment were pretextual.

---

protection.

[6] However, the Tenth Circuit has stated, in an unpublished opinion citing *Walker* with approval, that Tenth Circuit precedent "may also be read to prefigure the conclusion that the lawful taking of FMLA leave is a prerequisite to a retaliation claim."   *Wilkins v. Packerware Corp.*, 260 Fed. Appx. 98, 103 (10th Cir. 2008) (unpublished).

Defendants have come forward with two legitimate, non-discriminatory reasons for terminating his employment: poor performance and excessive absenteeism.  Accordingly, under *McDonnell-Douglas* the burden shifts to Brown to demonstrate that these reasons are mere pretext for unlawful discrimination.  Brown argues that he did not, in fact, have performance issues, citing positive performance evaluations and statements by McGill.  However, the Court need not decide whether Brown has successfully demonstrated the existence of pretext with regard to his job performance because he makes no similar effort to demonstrate that his excessive absences from work were not a true reason for his termination, but were instead mere pretext.  Therefore, one of Defendants' two nondiscriminatory reasons, excessive absences, remains unchallenged.  "[A]s a general rule, an employee must proffer evidence that shows each of the employer's justifications are pretextual." *See Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000).  It is undisputed that on February 8, 2007, when Mueller terminated Brown's employment, Brown had taken over fourteen weeks of FMLA leave, well in excess of the twelve weeks allotted for any twelve-month period.  It is also undisputed that Brown had just informed Mueller that he was going to be absent for an additional three weeks, also outside his protected FMLA leave.  Thus, it appears from the record that excessive absenteeism was a legitimate, non-discriminatory reason for firing Brown.  He cites no authority requiring Mueller, under the circumstances of this case, to provide him with the additional leave he requested.  Brown also comes forward with no evidence that Mueller's cited reason for the termination—excessive absenteeism—was pretextual.  Accordingly, for this alternate reason the Court will grant Defendants' motion for summary judgment on Brown's FMLA claim.

## IV.     CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In order to recover under a cause of action for intentional infliction of emotional distress

under New Mexico law, the plaintiff must show three elements: first, that the tortfeasor's conduct was extreme and outrageous under the circumstances; second, that the tortfeasor acted intentionally or recklessly; and third, that as a result of the conduct the claimant experienced severe emotional distress. *Coates v. Wal-Mart Stores, Inc.*, 127 N.M. 47, 57, 976 P.2d 999, 1009 (1999).

When considering the tort of intentional infliction of emotional distress, the New Mexico Court of Appeals recognized that the judiciary must set the threshold of outrageousness high enough so that the social good from recognizing the tort will not be outweighed by unseemly and invasive litigation on meritless claims. *Hakkila v. Hakkila*, 112 N.M. 172, 178, 812 P.2d 1320, 1326 (Ct. App.) *cert. denied*, 112 N.M. 77, 811 P.2d 575 (1991). Thus, the tort of intentional infliction of emotional distress "provides recovery to victims of socially reprehensible conduct." *Baldonado v. El Paso Natural Gas Co.*, 2008-NMSC-005, ¶ 24, 143 N.M. 288, 176 P.3d 277 (internal quotation marks and citation omitted). Thus, the Court must determine whether the evidence, viewed in the light most favorable to Brown, demonstrates outrageous conduct. "The Restatement [(Second) of Torts § 46 cmt. d (1965)] describes extreme and outrageous conduct as that which is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Trujillo v. N. Rio Arriba Elec. Coop, Inc.*, 2002-NMSC-004, ¶ 25, 131 N.M. 607, 41 P.3d 333. For example, in *Baldonado*, a gas explosion resulted in a fireball, which killed twelve members of an extended family. 2005-NMSC-005, ¶ 3. The plaintiff firefighters who responded to the scene alleged that the gas company defendant had failed to properly design and maintain gas pipelines, had been earlier cited for the failure, and had previously experienced the consequences of such failure in the form of two explosions. *Id*. ¶ 35. This knowledge, combined with the defendant's obligations under federal law to actively cooperate with firefighters, led the New Mexico Supreme Court to conclude that the

22

defendant's conduct was extreme and outrageous. *Id.* ¶¶ 33, 36. In contrast, the *Trujillo* court rejected a fired employee's claim for intentional infliction of emotional distress. 2002-NMSC-004, ¶¶ 27-28. The Court noted that "[b]eing fired is a common occurrence that rarely rises to the level of being beyond all possible bounds of decency and utterly intolerable in a civilized community" and that the plaintiff did not provide evidence to suggest that the defendant employer's conduct was extreme and outrageous. *Id.* ¶ 27 (internal quotation marks omitted).  In addition, the court determined that the employee did not suffer from distress "so severe that no reasonable [person] could be expected to endure it." *Id.* ¶ 28 (alteration in original) (internal quotation marks and citation omitted).

In this case, the Court concludes that Brown has failed to come forward with facts showing conduct by Mueller and McGill that rises to the level of "extreme and outrageous" as defined by New Mexico law.  Accordingly, Defendants are entitled to summary judgment on this claim.


**IT IS THEREFORE ORDERED** that *Plaintiff's Motion for Summary Judgment On His Claims for Violations of the Family and Medical Leave Act* [Doc. No. 93] is **DENIED**, and *Defendants' Motion for Summary Judgment* [Doc. No. 90] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants are entitled to summary judgment on all of Plaintiff's claims.



_____
**UNITED STATES DISTRICT JUDGE**